Jon A. Kodani, Esq. (SBN 86258)
Jeffrey J. Williams, Esq. (SBN 156401)
**LAW OFFICES OF JON A. KODANI**
2200 Michigan Avenue
Santa Monica, CA  90404
Tel. (310) 453-6762
Fax (310) 829-3340
E-mail: *lojak@kodanilaw.com*

Attorneys for Plaintiff **James R. Gibson**

FILED
CLERK, U.S. DISTRICT COURT

AUG - 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

LACV11-6326 JAK(SSx)

**JAMES R. GIBSON,**
a Louisiana citizen,

Plaintiff,

vs.

**CONCENTRA HEALTH SERVICES, INC.**, a Nevada corporation d/b/a Concentra Medical Center; and **DOES 1-10**, inclusive,

Defendants.

) Case No. CV 11-
)
)
) **COMPLAINT AND DEMAND FOR**
) **JURY TRIAL FOR:**
)
) 1. Intentional Interference With
)    Economic Relations
) 2. Malicious Prosecution
) 3. Negligence
) 4. Negligent Misrepresentation
) 5. Negligent Infliction of Emotional
)    Distress
) 6. Intentional Infliction of
)    Emotional Distress
) 7. Libel, Defamation, and Slander
) 8. False Light / Invasion of Privacy
) 9. Fraud / Deceit
) 10. Fraud / Concealment
)

James R. Gibson v. Concentra Health Services                    Complaint

Concentra Gibson / 20110801



Plaintiff James R. Gibson alleges:

### JURISDICTION

1.0 [Jurisdiction] This court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332(a). The plaintiff and the defendants are citizens of different states, and the amount in controversy in this matter exceeds $75,000.00 exclusive of interest and costs.

### VENUE

2.0 [Venue] Venue is proper in the United States District Court, Central District of California, under 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to this claim occurred in this district, at or near 6033 W. Century Blvd., Los Angeles, California.

### PARTIES

3.0 [π] Plaintiff JAMES R. GIBSON ("plaintiff" or "Gibson") is a citizen of the State of Louisiana, where he maintains a permanent residence with his family in Benton, Louisiana.

4.0 [Δ] Defendant CONCENTRA HEALTH SERVICES, INC. ("defendant" or "Concentra"), is a Nevada corporation with its principal place of business in the State of Texas. Concentra was incorporated in the State of Nevada on or about November 23, 1993. Concentra maintains and operates its principal place of business at 5080 Spectrum 1200, West Tower, Addison, Texas, which is also Concentra's "nerve center" and the place where Concentra's high level officers

- 2 -

direct, control, and coordinate Concentra's activities. At all relevant times, Concentra was doing business as Concentra Medical Center at 6033 W. Century Blvd., Los Angeles, California.

5.0 [Doe∆] At all times herein mentioned, the true names and capacities, whether individual, corporate, associate or otherwise of the defendants sued herein as DOES 1 through 10 ', inclusive, and each of them, are unknown to the plaintiff, and therefore plaintiff sues these defendants by such fictitious names. Plaintiff will amend this complaint to state the true names and capacities when the same have been ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the defendants named herein as a DOE is legally responsible in some manner for the events described below, and that each such defendant caused the injuries described below.

6.0 [Agency] Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, defendants, and each of them, were the agents, employees and servants of each of the other defendants, and, in doing the things herein alleged, did so within the course and scope of that agency and employment.

### CONCENTRA'S ALCOHOL TESTING BUSINESS

7.0    The Omnibus Transportation Employee Testing Act of 1991 requires random breath alcohol testing for all safety-sensitive transportation employees in the aviation industry, including professional airplane pilots. *See, e.g.*, 49 U.S.C. § 45102(a). The U.S. Department of Transportation (DOT) promulgates

- 3 -

comprehensive regulations to enforce those alcohol testing requirements. *See, e.g.*, 49 C.F.R. §§ 40.1 *et seq.*

8.0     Only facilities that have been approved by the DOT may conduct such breath alcohol testing. Securing DOT approval permits a company (such as Concentra) to engage in a lucrative business that generates substantial revenue and profits. DOT-approved testing facilities are always required to comply with all applicable DOT regulations concerning breath alcohol tests.

9.0     On August 12, 2010, Concentra was a DOT-approved facility authorized to administer breath alcohol testing. Based on the information provided to Concentra during the DOT approval process, and based on Concentra's involvement and participation in post-testing administrative review procedures, Concentra knew that any inaccurate or unreliable breath alcohol test results it generated would probably: (1) cause the U.S. Federal Aviation Administration (FAA) to immediately revoke a professional pilot's flying privileges on an emergency basis; (2) prematurely terminate the pilot's career as a professional pilot; (3) ruin the pilot's personal and professional reputation; (4) force the pilot to endure severe emotional distress, embarrassment, shame and humiliation; and (5) cause the pilot to suffer potentially catastrophic financial losses.

/ / /

Concentra Gibson/20110801

## CONCENTRA'S FAULTY BREATH ALCOHOL SCREENING TEST

10.0    On August 12, 2010, plaintiff Gibson was employed as a professional airplane pilot for a large company.  At around 11:09 a.m. on that date, Gibson was notified by his employer that he had been randomly selected to undergo a breath alcohol test as required by DOT regulations. Gibson was instructed to report to Concentra's facility at 6033 West Century Boulevard, Los Angeles, California, for a breath alcohol test.

11.0    Upon arriving at Concentra's facility at around 11:47 a.m., Gibson waited in an office lobby for about 20 minutes.  During that waiting time, Gibson was drinking from a 24-ounce container of a caffeinated sugar-free RockStar energy drink in plain view of Concentra's employees at Concentra's testing facility. While Gibson waited in the lobby, no one from Concentra told him to stop consuming the energy drink.  Concentra held itself out to be competent and reputable in the field of breath alcohol tests, and agreed to administer such a test for Gibson in accordance with applicable standards and DOT regulations.

12.0    Gibson was eventually met by J.A., a breath alcohol technician (BAT) employed by Concentra.  J.A. escorted Gibson to a holding room, where she observed Gibson holding and consuming the energy drink.  J.A. did not tell Gibson to stop consuming the energy drink.

///

- 5 -

13.0    After recording Gibson's body temperature, J.A. left Gibson alone in the holding room while she left to work on another test for another pilot in a different room.  During this time when J.A. left Gibson alone in the holding room, J.A. knew that Gibson continued to consume the energy drink.

14.0    J.A. eventually escorted Gibson to a breath alcohol testing machine (known as an Evidential Breath Testing Device or "EBT").  Concentra knew (but Gibson did not know) that this particular EBT machine had been stored by Concentra in an unlocked and unsecured area where it was accessible to anyone, and could be tampered with by anyone at Concentra's facility, which was open 24 hours every day.

15.0    Concentra also knew (but Gibson did not know) that this particular EBT machine had recently been removed from service because it was malfunctioning, and there were no reliable records of whether the EBT machine had ever been successfully repaired or returned to service. Concentra also knew (but Gibson did not know) that there were no accurate or reliable records showing whether this particular EBT machine had been calibrated in accordance with DOT regulations and the machine manufacturer's recommendations.

16.0    After being escorted to the EBT machine, Gibson placed his energy drink container near the side of the EBT machine in plain view of J.A.  Gibson continued to consume the energy drink as J.A. began setting up the EBT for the

Concentra Gibson/20110801

screening test used to measure Breath Alcohol Concentration (BAC).  Gibson was at all times cooperative with J.A. and willing to take the breath alcohol test.

17.0    At approximately 12:16 p.m., after Gibson had already consumed about 16 ounces of his energy drink in the presence of Concentra employees including J.A., J.A. conducted a BAC screening test using Concentra's  EBT machine.

18.0    Gibson had consumed no alcohol for at least 14 hours before the screening test, and J.A. did not observe Gibson display any objective signs of prior alcohol consumption.  However, the results of the BAC screening test conducted by J.A. reflected an inaccurate BAC level of .060.  The consumption of the energy drink immediately prior to the breath alcohol test being administered by J.A. caused the test to yield an inaccurate BAC level of .060.

19.0    Gibson and J.A. both expressed shock and surprise at the inaccurate .060 screening test result.  J.A. had never seen a positive BAC screening test result in her 7-year career, and she did not know what to do when Gibson's screening test showed a BAC level of .060.  Gibson asked J.A.: "*What does that mean?*"  J.A. responded: "*I'm not sure.  Wait here.*"  Gibson began consuming the energy drink again, when J.A. said: "*Wait.  You're not drinking that, are you?*"  Gibson replied: "*Yes, I've been drinking it.*"  J.A. then belatedly told Gibson to stop consuming the energy drink, and to wait in the testing room until she returned.  J.A. then left Gibson alone and unattended for several more minutes.

- 7 -

## CONCENTRA'S FAULTY BREATH ALCOHOL CONFIRMATION TEST

20.0    After the screening test yielded an inaccurate BAC level of .060, J.A. spoke with N.W., another BAT employed by Concentra.  J.A. told N.W. that the EBT machine J.A. had used for the screening test on Gibson was malfunctioning and having "*technical difficulties*."  After several minutes, J.A. and N.W. returned to the testing room where Gibson was still waiting.  N.W. looked at the EBT machine, and confirmed that the EBT machine was indeed malfunctioning.  The EBT machine displayed an "hour glass" which indicated the machine was frozen, and would not permit J.A. to conduct a follow-up confirmation test required by DOT regulations.  N.W. also observed that Gibson was consuming an energy drink.  J.A., N.W. and another Concentra employee who had entered the room (J.S.) all observed no objective signs of alcohol use by Gibson.

21.0    After resetting the EBT machine, N.W. instructed J.A. to disregard the screening test that had generated the inaccurate .060 BAC result, because the EBT machine was not working properly, and because Gibson had been consuming the energy drink immediately before the screening test was administered.  N.W. told J.A.: "*I think you should repeat this test, he has an energy drink, and that might have [an] effect [on] his test, so I want you to repeat it.*"  J.A. responded with a sarcastic "*Aye, Nicolassa*," and walked away from N.W., who left the testing room to tend to other patients at the clinic.

/ / /

Concentra Gibson/20110801

22.0    J.A. feared that if her supervisors at Concentra, including J.S. and L.D., learned that J.A. had administered a BAC screening test on Gibson using a malfunctioning EBT machine, or that J.A. had failed to instruct Gibson to discontinue consumption of the energy drink before administering the screening test, then J.A. would be exposed to possible punishment  or required to undergo additional training for violating DOT regulations.  J.A. decided to ignore N.W.'s instructions, and J.A. decided that she would *not* start over the process of conducting a BAC screening test on Gibson.

23.0    J.A. escorted Gibson back to the holding room, where Gibson again waited alone and unsupervised for several more minutes.  J.A. knew that a follow-up confirmation test was supposed to be administered 15 minutes after the screening test was conducted at 12:16 p.m., but because the EBT machine was malfunctioning, the confirmation test had to be delayed for several minutes.

24.0    At about 12:37 p.m., twenty-one minutes after the faulty and inaccurate BAC screening test was administered at 12:16 p.m., J.A. escorted Gibson from the holding room back to the same malfunctioning EBT machine that had earlier generated the inaccurate .060 BAC result.  J.A. proceeded to administer a follow-up confirmation test required by DOT regulations.  This confirmation test yielded an inaccurate BAC level of .041 only 21 minutes after the first test had generated an inaccurate BAC level of .060.  Concentra employee J.S. entered the room, did something to the EBT machine, but refused to discuss the inaccurate results with Gibson.  J.A. printed out the results of both inaccurate tests and affixed those results to an Alcohol Testing Form which was signed by

J.A.  J.A. refused to make any notations on the form to describe the malfunctioning EBT machine, Gibson's consumption of the energy drink, or N.W.'s instructions to disregard the screening test results.

### GIBSON'S ACCURATE BREATH ALCOHOL TEST RESULTS

25.0   Gibson knew that Concentra's BAC screening test and Concentra's BAC confirmation test were faulty, inaccurate, and/or misleading.  Gibson had consumed no alcohol for at least 14 hours before Concentra's faulty screening test was administered at 12:16 p.m. on August 12, 2010.

26.0   After being discharged from Concentra's facility, Gibson was driven to a local hospital, where Gibson attempted (without success) to have a *blood* alcohol test performed.  Gibson was then driven to a DOT-approved breath alcohol testing facility (Reliant Airport Medical Clinic, or "Reliant").  At 3:27 p.m. on August 12, 2010, Reliant administered a breath alcohol test using the exact same model EBT machine that was used by Concentra.  The Reliant test accurately yielded a BAC level of .000.

### CONCENTRA'S KNOWLEDGE

27.0   Concentra knew, or reasonably should have known, that the BAC tests administered by J.A. at 12:16 p.m. and 12:37 p.m. were inaccurate, unreliable, and misleading, and did not comply with the DOT's strict requirements for breath alcohol testing.

Concentra Gibson/20110801

28.0    The Concentra EBT machine J.A. used for that tests had been taken out
of service and "sent out for repairs" by Concentra because of a "malfunction" on
April 27-28, 2010, and there were no records of any repairs being performed,
and no record of the machine ever being properly returned to service.
Concentra's EBT machine had never been stored in a secure area at
Concentra's facility, there were no accurate records of the EBT machine being
properly calibrated, and Concentra had failed to instruct Gibson to discontinue
consuming his energy drink before the screening test was administered.  At
least two Concentra employees, J.A. and N.W., personally observed the EBT
machine malfunctioning before the confirmation test was administered.  J.A.
had ignored N.W.'s instructions to disregard the screening test results, and to
start over with a new screening test.

29.0    Concentra also knew, or reasonably should have known, that the results
of the two tests administered by J.A. were conflicting and impossible to
reconcile, proving that both test results were inaccurate, unreliable, and
misleading because: (1) the tests were not properly administered, and/or (2)
Concentra's EBT machine was malfunctioning.

30.0    The result of the BAC screening test (.060) could not have been
accurate, because Gibson had consumed no alcohol for at least 14 hours
before the screening test was administered.  When the confirmation test yielded
an inaccurate BAC level of .041 just 21 minutes after the screening test had
yielded a BAC level of .060, those results mean that Gibson had an alcohol
elimination rate of .019 in just 21 minutes (.054 per hour), an alcohol elimination

- 11 -

rate that is almost impossible in a human being, and a rate that is about 400% higher than would be expected for a non-alcoholic man of Gibson's size and weight. If Concentra's tests were accurate, then Gibson would had to have consumed a potentially fatal quantity of alcohol equal to more than 40 cans of beer 14 hours before the tests were administered.

## THE TERMINATION OF GIBSON'S EMPLOYMENT

31.0   Despite knowing that the tests administered by J.A. did not comply with DOT requirements, and despite knowing that the results of those tests were unreliable, inconsistent, inaccurate, and misleading, Concentra intentionally and maliciously reported those test results to Gibson's employer (Jet Solutions, LLC) on August 12, 2010, knowing that the inaccurate results would immediately end Gibson's career as a professional pilot, cause Gibson to endure extreme humiliation and emotional distress, and cause Gibson to suffer severe monetary losses.

32.0   Based solely on the inaccurate and unreliable results from the two breath alcohol tests administered by Concentra, Gibson was fired from his job as a professional pilot, which had been paying Gibson a salary of about $140,000 per year. The FAA temporarily revoked Gibson's flying privileges on an emergency basis on September 29, 2010, effectively ending Gibson's career as a professional pilot. Without work, Gibson was under a cloud of suspicion from his family, friends, and co-workers, and Gibson suffered severe and extensive depression, emotional distress, and catastrophic financial losses.

Concentra Gibson/20110801

33.0    Gibson's employer believed it had no choice but to fire Gibson after receiving the inaccurate, unreliable, and misleading BAC test results from Concentra.  Hearing the words "*You're fired*," after more than 11 years of devoted service to his employer, was very traumatic to Gibson.  Gibson had always been an excellent employee and pilot, receiving many letters of praise from people who had been his passengers over the years.  The sad and lonely flight back to his home in Louisiana from Los Angeles (where Concentra's faulty BAC tests had been administered) was unbearably agonizing, as Gibson believed that upon his return home, his family, friends, co-workers and others would all mistakenly believe that he had been drinking while on duty.

34.0    Gibson was told that he needed to see a Substance Abuse counselor if he ever hoped to revive his career and fly again as a professional pilot.  Gibson did so, which was terribly embarrassing, since Gibson had not abused alcohol, and was not an alcoholic.  Gibson was further humiliated every time he had to explain to family, friends and former co-workers why he was no longer employed or working as a pilot.  Gibson was forced to go to work selling recreational vehicles and do odd jobs, like cutting grass, at a fraction of his pay as a professional pilot, just to obtain some income.  Gibson also had to sell his family home in order to maintain health and insurance benefits that had previously been provided by his employer.  The loss of Gibson's home caused tremendous pain to Gibson's family, including his children.  The stress of not knowing if he would ever be able to return to the only occupation he had ever been trained to perform was unbearable.  Gibson has not been able to land

Concentra Gibson/20110801

another job as a professional pilot, and the associated anxiety, loss of sleep and excessive stress has caused him to lose over 20 pounds of weight.

## THE DESTRUCTION OF PHYSICAL EVIDENCE BY CONCENTRA

35.0   As a facility authorized by the DOT to conduct alcohol and drug tests required by the Omnibus Transportation Employee Testing Act of 1991, Concentra earns substantial revenue and profits from drug and alcohol tests it performs on pilots and others who are required by law to submit to those tests. This lucrative business would be jeopardized or lost altogether if it became publicly known that Concentra did not follow DOT regulations; Concentra's employees were inept, unqualified and not properly trained; and the results of tests administered by Concentra were neither accurate nor reliable.  At all relevant times, Concentra had a substantial financial incentive to conceal these facts at all costs, or risk losing its lucrative alcohol and drug testing business.

36.0   Concentra knew that its testing program was riddled with sloppy and noncompliant practices.  Concentra also know that the results of the breath alcohol tests it administered on Gibson were neither accurate nor reliable, and it knew that those tests did not comply with applicable DOT regulations.  To hide these facts, Concentra intentionally and maliciously destroyed, concealed, and altered the following material physical evidence:

36.1   On April 27 and 28, 2010, about three and one-half months before Concentra administered the breath alcohol tests on Gibson on August 12, 2010, Concentra reported that an EBT machine known as an Alcomonitor CC

- 14 -

serial no. 002114 had "malfunctioned" and been "sent out for repair."

Concentra claims that this same EBT machine was used for the Gibson's

breath alcohol tests. However, according to Concentra, EBT machine serial

no. 002114 was replaced with a different loaner machine (serial no. 002595)

on April 29, 2010, and Concentra deliberately concealed or destroyed records

which would have shown the nature and extent of the repairs (if any) that were

performed on machine serial no. 002114, and the date that machine was

returned to service (if it was at all) prior to Gibson's breath alcohol tests on

August 12, 2010. As far as Concentra's records showed, as of August 12,

2010 (when Gibson's breath alcohol tests were performed), J.A. should have

been using the loaner EBT machine serial number 002595, and not the

malfunctioning EBT machine serial number 002114.

36.2    DOT regulations and the machine manufacturer require

Concentra to perform calibration and accuracy checks on Concentra's EBT

machine at least once every day, and record those checks in a log book.

Concentra deliberately concealed or destroyed the log book entries which

would have shown whether any calibration and accuracy checks were

performed by Concentra between May 8, 2010 and July 22, 2010.

36.3    Concentra's EBT machine automatically performed self-calibration

tests at midnight each day, and the results of those automatic self-calibration

checks were supposed to be recorded in a log book. Concentra employees

also performed daily manual calibration tests each day (usually at 8:30 a.m.),

and the results of those manual calibration tests were recorded in a separate

- 15 -

log book.  Concentra deliberately concealed or destroyed those separate original log books, which would have shown problems with the accuracy of the EBT machine that was used for Gibson's breath alcohol tests.

36.4    Concentra deliberately altered and falsified material evidence by offering to Gibson photocopies of a different log book that had been manufactured by Concentra and included forged signatures of at least one Concentra employee (N.W.) to reflect calibration tests that had never actually been performed on the EBT machine that was used for Gibson's breath alcohol tests.  N.W. later testified under oath that these manufactured and falsified records from Concentra had been "*phonied up*" by Concentra.

## THE FALSE AND MISLEADING TESTIMONY FROM CONCENTRA

37.0    The FAA soon initiated administrative proceedings with the U.S. National Transportation Safety Board (NTSB) on October 6, 2010, to permanently revoke Gibson's flying privileges.  These proceedings were prompted solely by the inaccurate, unreliable and misleading breath alcohol tests administered by Concentra.  Concentra promoted and actively participated in the NTSB proceedings by and through its in-house counsel (M.T), and its outside counsel (P.S.) was present during the proceedings.

38.0    In furtherance of Concentra's scheme to intentionally destroy or alter physical evidence, and to promote Concentra's plan to deliberately injure and harm Gibson while protecting Concentra's own financial bottom line, Concentra lied to Gibson, the FAA and others, and coached and/or encouraged its

employees and representatives to offer false testimony during the NTSB administrative proceeding:

38.1    Concentra lied to Gibson, the FAA and others on August 18, 2010, when Concentra identified and produced a dry gas bottle that Concentra claimed was used to calibrate the EBT machine that Concentra used for Gibson's breath alcohol tests.  But in-fact, Concentra's own log books show that this dry gas bottle (lot no. AG014503) was never used for calibration tests on the subject EBT machine on or before Gibson's breath alcohol tests.  Concentra offered this false evidence in hopes of hiding the fact that the EBT machine used for Gibson's tests had not been properly calibrated.

38.2    Gibson knew (because he was present in the testing room) that an African-American employee of Concentra had entered the testing room with J.A., confirmed the EBT was indeed malfunctioning, and told J.A. to disregard the inaccurate screening test.  However, Gibson did not know the name of that employee, and therefore, Gibson could not secure her testimony in the NTSB proceedings.  Concentra knew that this African-American employee's testimony would be bad for Concentra's bottom line, and would expose the truth about Concentra's shoddy, error-riddled and noncompliant breath alcohol testing program.  Beginning on or about February 4, 2011, Gibson repeatedly asked Concentra to provide him with the name of the African-American employee.  In response, Concentra and/or its attorneys (M.T. and/or P.S.) lied to Gibson, and told Gibson, the FAA and the NTSB that

- 17 -

Concentra Gibson/20110801

there were no African-American employees at the facility when Gibson's breath alcohol tests were performed.  Concentra also encouraged and coached its employees, including J.A., to lie to Gibson, the FAA and others during depositions, by falsely denying the existence of any African-American employees at Concentra's facility where Gibson's breath alcohol tests were administered.

38.3    A Concentra supervisor (L.D.) testified under oath during the NTSB proceedings, and during cross-examination, L.D. admitted under oath that Concentra had lied, and that there *was* indeed an African-American employee who worked at Concentra when Gibson's breath alcohol tests were administered.  This prompted the NTSB Administrative Law Judge to suspend the proceedings to allow Gibson an opportunity to find and question this Concentra employee, after commenting that "*there's been a lot of work by the [FAA] and by Concentra to conceal who this person is.*"

38.4    The African-American employee (N.W.) was eventually contacted by Gibson, and she agreed to testify under oath at the NTSB proceedings, where she disclosed Concentra's scheming and lies by testifying that: (1) she *was* formerly employed by Concentra as a BAT; (2) some critical log books were *missing* and had not been produced by Concentra; (3) her signature had been *forged* on other log book entries to reflect calibration tests that were never performed; (4) she *was* present with J.A. during some of the testing; (5) Gibson *had* consumed much of his energy drink before the tests were administered; and (6) she did *not* believe the tests results were reliable or

- 18 -

accurate. This testimony from N.W. prompted the NTSB Administrative Law Judge to conclude that Concentra "*was not credible*," it "*doesn't have any credibility*," and it "*is just not credible.*"

### THE DISMISSAL OF THE NTSB ADMINISTRATIVE PROCEEDINGS

39.0    On May 27, 2011, NTSB Administrative Law Judge William R. Mullins dismissed the proceedings to permanently revoke Gibson's flying privileges (proceedings that had been prompted by Concentra's inaccurate test results, and supported by falsified physical evidence and untrue testimony from Concentra employees). Judge Mullins ruled in favor of Gibson on all material issues, and found that Concentra's test results were unreliable and inaccurate "*based on the lack of credibility of the breath alcohol technician* [J.A.] *and the issues raised not only by the difference in this two tests, the 60 and the 41, but also the independent testing that would indicate that there is some sort of impact by this [energy] drink on the breath alcohol testing device ...*"

40.0    Judge Mullins also found that Concentra's employee (J.A.) "*really didn't understand or know anything about the [EBT] machine, other than she knew which button to punch and -- or hopefully, she did -- and apparently didn't know which one to punch to reset it or when she was having problems with it, which prompted her to ask [N.W.] apparently to come in the room and assist her at some point.*"

/ / /

- 19 -

## CONCENTRA'S DELIBERATE, MALICIOUS, DESPICABLE CONDUCT

41.0    Concentra's deliberate and intentional conduct, including: (1) lying to Gibson and encouraging false testimony from J.A. and others; (2) lying about N.W.'s employment history with Concentra; (3) hiding the whereabouts of a material witness (N.W.) from Gibson; (4) and destroying and altering the EBT machine's log books and other physical evidence, was malicious and despicable, and was carried out with an intent to injure Gibson, and with a willful and conscious disregard of Gibson's rights.  One or more officers, directors, or managing agents of Concentra (including its attorneys, M.T. and P.S.) authorized or ratified Concentra's malicious and despicable conduct.

42.0    Concentra knowingly and intentionally concealed one or more material facts that were known to Concentra, including: (1) Concentra's breath alcohol tests did not comply with applicable DOT regulations; (2) Concentra's employees were sloppy, not qualified, and not properly trained; (3) N.W. *was* formerly employed by Concentra as a BAT; (4) Concentra had concealed, destroyed or lost some critical log books for the EBT machine used for Gibson's tests; (5) signatures had been *forged* on other log book entries to reflect calibration tests that were never performed; (6) N.W. *was* present with J.A. during some of the testing; (7) Gibson *had* consumed much of his energy drink before the tests were administered; and (8) the results of the breath alcohol tests were neither reliable nor accurate.  One or more officers, directors, or managing agents of Concentra (including its attorneys, M.T. and P.S.) authorized or ratified the concealment of these facts.  Concentra hid and concealed these facts from Gibson with the intention of depriving Gibson of his

- 20 -

rights and otherwise causing injury to Gibson, including the loss of his career as a professional pilot, and the ensuing shame, humiliation and severe emotional distress associated with the inaccurate breath alcohol test results generated by Concentra's shoddy practices.

## THE CAUSE OF GIBSON'S INJURIES AND DAMAGES

43.0   But for Concentra's intentional, malicious and despicable conduct, Gibson would not have had his flying privileges revoked, and he would not have lost his job.  Because of Concentra's intentional, malicious and despicable conduct, Gibson has endured severe emotional distress, embarrassment, shame and humiliation, and he has suffered extraordinary and continuing financial losses.

/ / /

/ / /

Concentra Gibson/20110801

### FIRST CLAIM FOR RELIEF
### For Intentional Interference With Prospective Economic Relations

44.0    Plaintiff refers to paragraphs 1.0 through 43.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

45.0    Between August 12, 2010 and May 27, 2011, the defendants intentionally interfered with an economic relationship between Gibson and his employer, Jet Solutions, LLC, that probably would have resulted in an economic benefit to Gibson.

46.0    Prior to August 12, 2010, Gibson and Jet Solutions, LLC, were in an economic relationship that probably would have resulted in an economic benefit to Gibson.  Gibson was employed by Jet Solutions, LLC as a professional pilot earning a salary of about $140,000 per year.

47.0    On August 12, 2010, the defendants knew that Gibson was employed as a professional pilot by Jet Solutions, LLC.

48.0    The defendants intended to disrupt the relationship between Gibson and Jet Solutions, LLC.

49.0    Between August 12, 2010 and May 27, 2011, the defendants engaged in wrongful conduct for the purpose of disrupting the relationship between Gibson and Jet Solutions, LLC., including but not limited to:

/ / /

- 22 -

49.1    Falsely representing to Gibson, the FAA, NTSB, Jet Solutions, LLC, and others that the results of the defendants' breath alcohol tests were reliable, accurate, and administered in accordance with applicable standards and DOT regulations; and/or

49.2    Lying to Gibson about N.W.'s employment history with the defendants, and encouraging false testimony from J.A. and others; and/or

49.3    Concealing the whereabouts of a material witness (N.W.) from Gibson; and/or

49.4    Destroying and altering the EBT machine's log books and other physical evidence; and/or

49.5    Using sloppy, unqualified, and not properly trained employees to administer Gibson's breath alcohol tests; and/or

49.6    Concealing, destroying or losing critical log books for the EBT machine that was used for Gibson's breath alcohol tests; and/or

49.7    Forging signatures on other log book entries to reflect calibration tests that were never performed.

50.0    Because of the defendants' wrongful conduct, the relationship between Gibson and Jet Solutions, LLC, was disrupted, and Gibson was fired and can no longer work as a professional pilot.

51.0   The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

52.0   The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

53.0   As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

## SECOND CLAIM FOR RELIEF
### For Malicious Prosecution / Wrongful Use of Administrative Proceedings

54.0   Plaintiff refers to paragraphs 1.0 through 53.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

55.0   Between October 6, 2010 and May 27, 2011, the defendants inflicted harm upon Gibson by aiding or abetting a malicious prosecution which

Concentra Gibson/20110801

someone else (the FAA) instituted to permanently revoke Gibson's flying privileges.

56.0   The defendants were actively involved in bringing or continuing the administrative proceeding, by voluntarily cooperating and providing the FAA with witnesses, documents and material information.

57.0   The FAA did not conduct an independent investigation, rather, the FAA rubber-stamped the defendants' conclusions and relied on the defendants' advise and counsel.

58.0   On May 27, 2011, the administrative proceeding ended in Gibson's favor, when the FAA's request to permanently revoke Gibson's flying privileges based on the defendants' breath alcohol tests was denied, and the FAA elected not to appeal that decision.

59.0   No reasonable person in the defendants' circumstances would have believed that there were reasonable grounds to bring the proceeding against Gibson.  The defendants knew that the results of Gibson's breath alcohol tests were not accurate or reliable, and had not been administered in accordance with applicable standards and DOT regulations.

60.0   The defendants acted primarily for purposes other than succeeding on the merits of the claim.  The defendants acted to protect its own lucrative financial interests in breath alcohol tests, avoid embarrassing disclosures about

- 25 -

its shoddy testing practices, and avoid costly retraining and recertification required by DOT regulations.

61.0    The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

62.0    The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

63.0    As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### THIRD CLAIM FOR RELIEF
#### For Negligence

64.0    Plaintiff refers to paragraphs 1.0 through 63.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

Concentra Gibson/20110801

65.0 [Duty1] At all relevant times, the defendants voluntarily undertook, assumed and/or owed the following legal duties and/or responsibilities so as to avoid generating inaccurate and unreliable test results that would naturally lead to a termination of employment, and ensuing stress, anxiety, pain, humiliation, grief, shame and depression:

65.1    To carefully and properly comply with all applicable statutes, regulations, procedures, standards and requirements during breath alcohol tests, including but not limited to U.S. Code of Federal Regulations, Title 49, Part 40, Subparts J, K, L, M, and P.

65.2    To carefully and properly perform its duties and responsibilities during breath alcohol tests, and/or

65.3    To carefully and properly inform Gibson's employer and/or the FAA that the results of the screening and confirmation tests performed by Concentra on August 12, 2010, could be attributable to causes other than Gibson's consumption of alcohol, such as: (1) Gibson's consumption of an energy drink; (2) a malfunctioning EBT machine; or (3) an improperly administered test, and/or

65.4    To carefully and properly provide pilots with adequate warnings and instructions during breath alcohol tests, and/or

Concentra Gibson/20110801

65.5    To carefully and properly communicate with pilots during breath alcohol tests, and/or

65.6    To carefully and properly develop, formulate, plan, create and/or assemble methods, tools, and procedures for preventing breath alcohol tests from generating inaccurate and unreliable results, and/or

65.7    To carefully and properly maintain all appropriate and necessary records needed to verify or confirm the accuracy and reliability of breath alcohol tests administered while using Concentra EBT machines, and/or

65.8    To carefully and properly select, hire, train, supervise, monitor and/or instruct their employees to perform their duties and responsibilities in connection with breath alcohol tests in a competent and safe manner.

66.0 [Breach1] The defendants negligently, carelessly, and/or recklessly:

66.1    Failed to carefully and properly comply with all applicable statutes, regulations, procedures, standards and requirements during breath alcohol tests, including but not limited to U.S. Code of Federal Regulations, Title 49, Part 40, Subparts J, K, L, M, and P.

66.2    Failed to carefully and properly perform its duties and responsibilities during breath alcohol tests, and/or

66.3   Failed to carefully and properly provide pilots with adequate warnings and instructions during breath alcohol tests, and/or

66.4   Failed to carefully and properly inform Gibson's employer and/or the FAA that the results of the screening and confirmation tests performed by Concentra on August 12, 2010, could be attributable to causes other than Gibson's consumption of alcohol, such as: (1) Gibson's consumption of an energy drink; (2) a malfunctioning EBT machine; or (3) an improperly administered test, and/or

66.5   Failed to carefully and properly communicate with pilots during breath alcohol tests, and/or

66.6   Failed to carefully and properly develop, formulate, plan, create and/or assemble methods, tools, and procedures for preventing breath alcohol tests from generating inaccurate and unreliable results, and/or

66.7   Failed to carefully and properly maintain all appropriate and necessary records needed to verify or confirm the accuracy and reliability of breath alcohol tests administered while using Concentra EBT machines, and/or

66.8   Failed to carefully and properly select, hire, train, supervise, monitor and/or instruct their employees to perform their duties and responsibilities in connection with breath alcohol tests in a competent and safe manner.

67.0  [Duty2]  At all relevant times, the defendants voluntarily undertook, assumed and/or owed a legal duty and/or responsibility to communicate truthfully and honestly with the FAA, NTSB and others during administrative proceedings arising from breath alcohol tests results administered by Concentra.

68.0  [Breach2]  The defendants negligently, carelessly, and/or recklessly failed to communicate truthfully and honestly with the FAA, NTSB and others during administrative proceedings arising from breath alcohol test results administered by Concentra.

69.0  [Duty3]  At all relevant times, the defendants voluntarily undertook, assumed and/or owed a legal duty and/or responsibility to use the level of skill, knowledge, and care during Gibson's breath alcohol tests that other reasonably careful breath alcohol test administrators would use in similar circumstances.

70.0  [Breach3]  The defendants negligently, carelessly, and/or recklessly failed to use the level of skill, knowledge, and care during Gibson's breath alcohol tests that other reasonably careful breath alcohol test administrators would use in similar circumstances.

71.0  [Causation]  The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property,

- 30 -

and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

72.0  As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### FOURTH CLAIM FOR RELIEF
### For Negligent Misrepresentation

73.0   Plaintiff refers to paragraphs 1.0 through 72.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

74.0   On or about August 12, 2010, the defendants represented to Gibson's employer, the FAA, and others that the following important fact was true: that tests administered pursuant to applicable standards and regulations confirmed that Gibson had a BAC level of .060 and .041 on August 12, 2010.

75.0   The defendants' representation was not true: Gibson had a BAC level of .000 on August 12, 2010.

76.0   The defendants had no reasonable grounds for believing their representation was true when it was made.

Concentra Gibson/20110801

77.0   The defendants intended that Gibson's employer, the FAA, and others rely on this representation.

78.0   Gibson's employer, the FAA, and others reasonably relied on the defendants' representation, by firing Gibson, temporarily revoking Gibson's flying privileges, and attempting to permanently revoke those privileges.

79.0   The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

80.0   As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### FIFTH CLAIM FOR RELIEF
### For Negligent Infliction of Emotional Distress

81.0   Plaintiff refers to paragraphs 1.0 through 80.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

Concentra Gibson/20110801

82.0    The defendants were negligent in the manner described above.


83.0    Plaintiff suffered serious emotional distress.   A reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by defendants' negligent conduct.


84.0    The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).


85.0    As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.


/ / /

/ / /

## SIXTH CLAIM FOR RELIEF
### For Intentional Infliction of Emotional Distress

86.0  Plaintiff refers to paragraphs 1.0 through 85.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

87.0   The defendants' conduct, described above, was outrageous, and so extreme that it goes beyond all possible bounds of decency.  A reasonable person would regard the defendants' conduct as intolerable in a civilized community.  The defendants abused a position of authority or a relationship that gave defendants real or apparent power to affect plaintiff's interests.  The defendants knew that plaintiff was particularly vulnerable to emotional distress that would arise from the probable and natural consequences of an inaccurate and misleading breath alcohol test.  The defendants knew that their conduct would likely result in harm due to mental distress.

88.0   The defendants intended to cause plaintiff emotional distress, and/or acted with reckless disregard of the probability that plaintiff would suffer emotional distress, knowing that plaintiff was present when the conduct occurred.  The defendants knew that emotional distress would probably result from their conduct, and/or the defendants gave little or no thought to the probable effects of their conduct.

89.0   Plaintiff suffered severe emotional distress, including  suffering, anguish, fright, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

Plaintiff's severe emotional distress was neither mild nor brief; it was so substantial and long lasting that no reasonable person in a civilized society should be expected to bear it.

90.0   The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

91.0   The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

82.0   As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

/ / /

/ / /

## SEVENTH CLAIM FOR RELIEF
## For Libel, Defamation, and Slander

93.0    Plaintiff refers to paragraphs 1.0 through 92.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

94.0    The defendants made the following statement to a person/persons other than plaintiff, including but not limited to plaintiff's employer and/or the FAA; *Plaintiff had a BAC level of .061 and .040 at the time of a random breath alcohol test administered pursuant to DOT regulations on August 12, 2010.*

95.0    The persons to whom this statement was communicated reasonably understood that the statement was about plaintiff.

96.0    The persons to whom this statement was communicated reasonably understood the statement to mean that plaintiff had violated DOT and FAA regulations and was no longer fit to perform the job responsibilities of a professional pilot because he had consumed an excessive amount of alcohol while on active flight duty.

97.0    Because of the facts and circumstances known to the listeners/readers of the defendants' statement, the defendants' statement tended to injure plaintiff in his occupation and/or to expose him to hatred, contempt, ridicule, or shame, or to discourage others from associating or dealing with plaintiff.

98.0    The defendants failed to use reasonable care to determine the truth or falsity of the statement.

- 36 -

99.0   The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

100.0  The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

101.0  As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### EIGHTH CLAIM FOR RELIEF
### For False Light / Invasion of Privacy

102.0  Plaintiff refers to paragraphs 1.0 through 101.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

103.0  On or about August 12, 2010, the defendants publicized information or material that showed Gibson in a false light, including but not limited to the

- 37 -

results of breath alcohol tests performed by the defendants in violation of applicable standards and regulations that falsely and incorrectly suggested Gibson had a BAC level of .060 and .041, and had been consuming alcohol while on active duty as a professional pilot.  This information was made public either by communicating it to the public at large or to so many people that the information or material was substantially certain to become public knowledge.

104.0  The false light created by the defendants' publication would be highly offensive to a reasonable person in Gibson's position.

105.0  The defendants knew the publication would create a false impression about Gibson or acted with reckless disregard for the truth.

106.0  The defendants were negligent in determining the truth of the information or whether a false impression would be created by its publication.

107.0  The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

Concentra Gibson/20110801

108.0  The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

109.0  As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### NINTH CLAIM FOR RELIEF
### For Fraud / Deceit / Intentional Misrepresentation / False Promise

110.0  Plaintiff refers to paragraphs 1.0 through 109.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

111.0  On or about August 12, 2010, the defendants' statements and conduct impliedly represented to Gibson that the following important facts were true:

111.1  The breath alcohol tests administered by the defendants would be administered in compliance with applicable standards and/or DOT regulations;

111.2  The defendants employees were careful, qualified, and properly trained to administer breath alcohol tests required by DOT regulations; and/or

111.3  The results of the breath alcohol tests performed by the defendants on August 12, 2010 would be accurate and reliable.

Concentra Gibson/20110801

112.0  The defendants' representations were false:

112.1  The breath alcohol tests administered by the defendants would *not* be administered in compliance with applicable standards and/or DOT regulations;

112.2  The defendants employees were sloppy, unqualified, and not properly trained to administer breath alcohol tests required by DOT regulations; and/or

112.3  The results of the breath alcohol tests performed by the defendants on August 12, 2010 were *not* accurate and reliable.

113.0  The defendants knew that the representations were false when made by the defendants, and/or the defendants made the representations recklessly and without regard for the truth.

114.0  The defendants intended that Gibson rely on the representations.

115.0  Gibson reasonably relied on the defendants' representations, by agreeing to allow the defendants to administer breath alcohol tests on August 12, 2010.  But for the defendants' representations, Gibson would not have allowed the defendants to administer the breath alcohol tests on August 12, 2010, and Gibson would not have lost his job or suffered ensuing damages and injuries.

116.0  The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

117.0  The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

118.0  As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

### TENTH CLAIM FOR RELIEF
### For Fraud / Concealment

119.0  Plaintiff refers to paragraphs 1.0 through 118.0, inclusive, above, and incorporates those paragraphs by reference as though set forth in full.

120.0  The defendants and Gibson were in a private and confidential relationship arising from the defendants role as an approved provider of mandatory breath alcohol testing services for professional pilots and others.

- 41 -

121.0  On August 12, 2010, the defendants intentionally failed to disclose the following important facts to Gibson; the defendants disclosed some facts to Gibson but intentionally failed to disclose other important facts, making the disclosure deceptive; the defendants intentionally failed to disclose the following important facts that were known only to the defendants and that Gibson could not have discovered; and/or the defendants actively concealed the following important facts from Gibson or prevented him from discovering those facts:

121.1  The breath alcohol tests administered by the defendants would not be in compliance with applicable standards and/or DOT regulations;

121.2  The defendants employees were sloppy, not qualified, and not properly trained to administer breath alcohol tests required by DOT regulations; and/or

121.3  The results of the breath alcohol tests performed by the defendants on August 12, 2010 would not be accurate or reliable.

122.0  On August 12, 2010, Gibson did not know of the concealed facts listed above.

123.0  Concentra intended to deceive Gibson by concealing these facts.

124.0  Gibson reasonably relied on Concentra's deception, and allowed Concentra to administer breath alcohol tests on August 12, 2010.  But for the

- 42 -

defendants' concealment of material facts, Gibson would not have allowed the defendants to administer the breath alcohol tests on August 12, 2010, and Gibson would not have lost his job or suffered ensuing damages and injuries.

125.0  The defendants' conduct was a substantial factor in causing the plaintiff to suffer economic losses and damages (including but not limited to financial losses, litigation fees and expenses, medical expenses, past and future loss of earnings, loss of use of property, costs of replacement of property, and loss of employment opportunities), and noneconomic damages (including but not limited to severe emotional distress, pain, suffering, inconvenience, mental suffering, injury to reputation, shame, embarrassment, public humiliation, grief, anxiety and depression).

126.0  The defendants' conduct and actions, described above, show that the defendants are guilty of malice, fraud, and/or oppression as defined in Civil Code § 3294, and plaintiff should recover, in addition to actual damages, damages to make an example or and to punish defendants.

127.0  As a direct and proximate result of the conduct of the defendants and/or defendants' employees, plaintiff has been damaged in a sum to be proven at the time of trial, in excess of the minimum jurisdiction of this Court.

/ / /

Concentra Gibson/20110801

## **PRAYER**

**WHEREFORE**, plaintiff prays for judgment against defendants as follows:


1.    For general, compensatory and special damages in sums according to proof;

2.    For punitive and exemplary damages in sums according to proof;

3.    For interest on said sums as provided by law, if any;

4.    For reasonable attorneys fees as provided by law, if any;

5.    For costs of suit incurred herein; and

6.    For such other and further relief as the court deems just and proper.


Respectfully Submitted,

Dated:  August _1_ , 2011



Jon A. Kodani, Esq.
Jeffrey J. Williams, Esq.
LAW OFFICES OF JON A. KODANI

**Attorneys for Plaintiff
James R. Gibson**

2200 Michigan Avenue
Santa Monica, CA 90404-3906
Tel. (310) 453-6762
Fax (310) 829-3340
**Email** *lojak@kodanilaw.com*

Concentra Gibson/20110801